# UNITED STATES DISTRICT COURT

NORTHERN                DISTRICT OF    ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ANTHONY VALENTINO

**F I L E D**
5-21-08
MAY 2 1 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT.

CRIMINAL COMPLAINT
MAGISTRATE JUDGE ASHMAN

CASE NUMBER:

**08CR        407**

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

Between on or about July 17, 2007 and on or about August 8, 2007, in Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant, Anthony Valentino, being an agent of the City of Chicago, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, namely $500 cash, intending to be influenced or rewarded in connection with any business, transaction, and series of transactions of the City of Chicago, involving anything of value of $5,000 or more, the City of Chicago being a local government that received in excess of $10,000 in federal funding in a twelve month period from August 8, 2006, through August 8, 2007;

In violation of Title 18, United States Code, Section 666(a)(1)(B).

I further state that I am a Postal Inspector, United States Postal Inspection Service, and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof:   _X_   Yes        ____ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

May 21, 2008
Date

at   Chicago, Illinois
City and State

Hon. Martin Ashman, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, David B. Hodapp, being duly sworn under oath, depose and state as follows:

### I.      BACKGROUND OF AFFIANT

1.      I am a Postal Inspector with the United States Postal Inspection Service and have been so employed since September 1987. In connection with my official duties, I have investigated violations of federal criminal law, including violations relating to public officials. I have received training and participated in all normal methods of investigation, including, but not limited to, visual and electronic surveillance, the general questioning of witnesses, the use if informants, and undercover operations. I have also received training in the enforcement of laws concerning, among other things, public corruption and white-collar crime.

### II.     PURPOSE OF AFFIDAVIT

2.      This affidavit is made for the limited purpose of establishing probable cause in support of a criminal complaint charging ANTHONY VALENTINO with violation of Title 18, United States Code, Section 666(a)(1)(B), charging that between on or about July 17, 2007 and on or about August 8, 2007, VALENTINO, being an agent of the City of Chicago, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, and series of transactions of the City of Chicago, involving anything of value of $5000 or more, the City of Chicago being a local government that received in excess of $10,000 in federal funding in a twelve month period from August 8, 2006 through August 8, 2007.

1

3.    More specifically, in 2007, VALENTINO worked as a City of Chicago inspector in the Department of Zoning. As more fully described below, VALENTINO accepted three cash bribes from a cooperating witness (CW1) believing that CW1 had collected each of the three $500 cash bribes from developers paying the bribes in exchange for VALENTINO providing fraudulent favorable zoning inspection reports related to Certificates of Occupancy for properties located at 2754 West Washington Boulevard, 1453 West Garfield Boulevard, and a property on Walton Street. On June 6, 2007, VALENTINO accepted a $500 bribe from CW1 in exchange for providing a favorable zoning inspection report for the property at 1453 West Garfield Boulevard. On June 14, 2007, VALENTINO accepted a $500 bribe from CW1 in exchange for providing a favorable zoning inspection report for the Walton Street property. On August 8, 2007, VALENTINO accepted a $500 bribe from CW1 in exchange for providing a favorable zoning inspection report for the property at 2754 West Washington Street.

4.    This investigation has been jointly conducted by the United States Postal Inspection Service ("USPIS"), the City of Chicago Office of Inspector General ("IG") and the Federal Bureau of Investigation ("FBI"). The information contained in this Affidavit is based on my personal knowledge as well as information obtained from other law enforcement agents participating in the investigation, cooperating witnesses, documents, and recorded conversations. Since this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set

forth only the facts that I believe are necessary to establish probable cause to believe that

VALENTINO committed a violation of 18 U.S.C. § 666.

III.    **EXPLANATION OF THE BUILDING PERMIT PROCESS AND CITY**

     **DEPARTMENTS**

    5.    The process for issuing building permits and monitoring construction

projects is governed by several departments within the City of Chicago, including the

Department of Zoning ("Zoning"), the Department of Construction and Permits

("DCAP"), the Department of Buildings ("Buildings") and the Department of

Administrative Hearings ("AH").

    6.    The principal role of Zoning is to enforce Chicago's Zoning Ordinance, to

implement the city's land use policies and to maintain and update the city's official

zoning maps. Developers seeking to obtain a building permit for new construction and

renovation projects which require architecture plans receive an initial review of their

architectural plans in Zoning to assure that the project conforms to the official zoning and

land use policies of the City of Chicago.  Zoning reviews the survey plats, parking lot

layouts and site plans to ensure that projects conform to the Zoning Ordinance.  When a

proposed development is not in compliance with the Zoning Ordinance or permitted use,

a developer has the option of seeking an administrative adjustment or a zoning variance.

The administrative adjustment process is a streamlined procedure for minor

modifications of selected zoning standards.  The zoning variance procedures involve

review and approval of the requested changes by the Zoning Board of Appeals.  Zoning

is also responsible for administering the landscape ordinance within the zoning code

which governs landscaping of all business, commercial and large residential projects. In addition, zoning is responsible for issuing Certificates of Occupancy (a certificate from the City certifying that a structure is fit for human habitation) for construction projects containing between one to three dwelling units and for issuing Zoning Compliance Certificates (a certificate from the City certifying that a structure meets the applicable zoning requirements) for the occupancy, use, or change of use of any property in the city. Projects receive an initial review in Zoning by a zoning plan examiner ("ZPE"). On-site investigation of projects to ensure compliance with the Zoning Ordinance, including the landscape ordinance, and Certificate of Occupancy reviews are performed by zoning inspectors.

7.     DCAP is responsible for issuing construction permits.  Prior to the creation of DCAP in April 2003, construction permits were issued by Buildings.  A permit application must include the names and City license numbers of the general contractor and each subcontractor who intends to work on the construction project.  To obtain a general contractor's license from the City, an applicant must mail a license application to an address maintained by the Department of Buildings.  License applications must be renewed by mail every year.  Generally, the construction permit application process follows one of three different tracks: the Easy Permit Process ("EPP"), Standard Review Plan process, or Developer Services process.  EPP is used to obtain construction permits for repair or replacement of existing elements of a building, when no structural changes to the building will be made.  Standard Review Plan (also referred to as Open Plan Review) is used to obtain construction permits for small to mid-

sized construction and renovation projects requiring architectural drawings. The Standard Review Plan process involves an initial assessment of a construction project by a DCAP project manager. After the project manager review, the architectural plans receive technical reviews of appropriate disciplines which include, among others, electrical, plumbing, ventilation, structural, architectural, landscape and fire prevention. The purpose of each discipline review is to ensure that the proposed project is in conformance with the building codes and regulations of the City of Chicago. The Developer Services process is used to obtain construction permits for large and complex projects. In January 2008, DCAP merged back into the Buildings Department.

8.    Buildings is responsible for the enforcement of the Chicago Building Code governing the construction, rehabilitation and maintenance of structures within the City of Chicago. Within Buildings is the New Construction Bureau. New construction inspectors' primary role is to perform inspections to ensure that construction and renovation work conforms to the permits that have been issued by DCAP. Building inspectors can also respond to complaints regarding structures, including emergencies that occur after working hours, and they can issue violation notices to building owners when a structure is not in conformance with the Building Code. Inspections can also be generated by the public by dialing 311, the non-emergency number for city services. Inspectors can also issue "stop work orders" to stop any construction that is done without a permit, contrary to an approved permit, and other forms of construction that poses a threat to the health and safety of the public. A stop work order is a directive from the Department of Buildings, addressed to the owner of property on which construction or

demolition work is proceeding without proper authorization. The stop work order prohibits further work, and in some cases requests the removal of work already completed, until or unless an appropriate construction permit has been obtained. There are different procedures for releasing each kind of stop work order, which can include paying fines and/or paying additional permit fees. Some releases can occur at the City's satellite offices (additional offices located in various neighborhoods for the convenience of property owners and developers), while others involve the applicant presenting the plans and application to the DCAP or to another Department, usually at City Hall. Inspectors sign the back of a contractor's construction permit when an inspection is performed and the inspector determines that the completed work is within the requirements of the Building Code and the scope of the construction permit. Certificates of Occupancy for construction and renovation projects involving four or more units are also issued by Buildings. Building Inspectors conduct inspections of projects prior to the issuance of Certificates of Occupancy. Finally, Buildings has historically maintained a mainframe computer database that contains information about buildings in the City of Chicago, including the number of original units in each building.

9.    AH serves as a quasi-judicial tribunal for the expedient, independent and impartial adjudication of municipal ordinance violations. AH has several divisions, including a Building Division. The purpose of the Building Division is to adjudicate cases initiated by the Buildings, Fire and Zoning departments.

10.    Contractors, developers, and homeowners may hire a permit expediter to facilitate the construction permit application process. The services performed by a

permit expediter include, among other things: completing construction permit application forms; collecting and submitting relevant documents to DCAP and Zoning; waiting in line at City Hall for plan reviews; scheduling building inspections; meeting with architects, contractors, developers, homeowners, City of Chicago inspectors and other City of Chicago officials; resolving building code violations; and obtaining Certificates of Occupancy.    City of Chicago employees are prohibited from acting as permit expediters.

11.    Obtaining timely reviews, approvals, and permits is important to developers. Waiting for a lengthy period of time for a review, failing to pass an inspection, or the issuance of a stop work order can have significant financial consequences for developers. These circumstances can preclude developers from starting or completing the work that needs to be done on a project (thereby lengthening the period of time for a project which may add costs or at least delay the time at which a developer can recoup capital tied up in a project), or require developers to do additional work on a project (thereby increasing the cost of the project).  For example, as described in detail below, VALENTINO accepted a bribe payment in exchange for providing favorable a favorable zoning inspection report related to a Certificate of Occupancy for a property located at 2754 West Washington Boulevard.  A Certificate of Occupancy is significant from a financial standpoint for the developer because, typically, financial institutions will require the Certificate of Occupancy before agreeing to lend money to a buyer for the purchase of the property.  Thus, until the Certificate of Occupancy is issued, a developer

is unable to sell the property or units in the property and recoup capital put into the project.

## IV.     THE INVESTIGATION

12.     This phase of the criminal investigation began in April 2007, when investigators obtained information concerning a shakedown scheme involving certain individuals, including a particular "expediter," who assisted contractors and developers in the permit application process. Specifically, evidence indicated that a certain building inspector was posting stop work orders on properties and agreeing to lift the order only if the property's owner used this particular expediter. In May 2007, law enforcement agents interviewed the expediter (hereinafter referred to as CW1).[1]

13.     CW1 admitted to paying bribes to City employees for a variety of actions, non-actions, favorable reports or to facilitate a quicker-than-normal inspection or review from approximately 2001 through May 2007. CW1 also admitted to CW1's role in accepting bribes from developers and contractors, which CW1 would pass on to City employees.

---

[1] CW1 has not been charged with any crime. CW1 understands that he/she will be charged with a violation of federal criminal law. No promises have been made regarding what charges will be brought or what sentence CW1 will receive. CW1 is cooperating with the government in the hopes of receiving a benefit in the determination of what charges will be brought and what sentence will be recommended by the government. CW1 has no previous arrests or convictions. Investigators believe CW1 to be reliable. Although CW1 lied to agents during the initial interview about the nature and scope of CW1's relationship with City employees, CW1 has subsequently spoken with investigators numerous times under proffer protection, and is believed to have provided truthful information. CW1 has provided information about bribery activities by over thirty individuals. This information has been corroborated for a number of those individuals by recorded conversations and/or controlled bribe payments.

14.    CW1 began actively cooperating with the government in May 2007. CW1's cooperation has included conducting consensually recorded calls and meetings, as well as playing the role of "bagman" (collecting bribe money from developers and contractors seeking some official act from a City employee or a "priority" handling of a project and paying the bribes to City of Chicago employees).[2]

15.    CW1 has advised law enforcement that it was the practice of developers and contractors with whom CW1 has worked to express a willingness to bribe a City official for actions typically by using coded language, such as "do whatever it takes" (to get an action accomplished).  CW1 would also use coded language by asking a developer or contractor if CW1 has a "budget" to work with or if this action is a "priority."  CW1 would also use coded language in communicating with the City official, by saying, for example, that an "incentive" is available.  In other instances, City officials would solicit bribe payments from CW1 initially, and CW1 would then communicate this to the

_____

[2]

On June 1, 2007, CW1 entered into a consent agreement with the USPIS to allow the government to autorecord all communications transmitted or received on CW1's cellular telephone in which CW1 participated (including voicemail messages left for CW1).  This agreement allowed CW1 to make and receive calls during the course of this investigation outside of the presence of a Postal Inspector and to conduct CW1's business as an expediter. Under the agreement, CW1 was not allowed to let anyone other than CW1 use the cellular telephone and CW1 was also limited to using the cellular telephone for conducting business as an expediter. All calls were recorded. CW1 had no control over the autorecord and could not manipulate whether a call was recorded or not. Pursuant to court orders issued approximately every thirty or sixty days, beginning on June 4, 2007 and continuing to March 28, 2008, (with the exception of a period of time in January 2008 during which the autorecord was not renewed) signed by either the Chief Judge or Acting Chief Judge, all calls sent or received from CW1's cellular telephone for a period of thirty or sixty days were recorded using the same technology employed in a Title III wiretap but without the requirement of contemporaneous monitoring by law enforcement agents.

developer or contractor. The developer or contractor would then pay CW1 for expediting services in addition to the amount of any bribes that CW1 was to pay to City officials.

16.    According to CW1, developers and contractors will pay bribes to employees in Zoning for: a) overlooking violations of the Zoning Ordinance; b) increasing the reported number of existing dwelling units in a building being rehabbed to avoid a costly and time-consuming zoning variance process; c) providing a favorable or expedited inspection for a Certificate of Occupancy; and d) expediting a Zoning Compliance Certificate faster than the normal process. CW1 has admitted to paying bribes to zoning inspectors for these actions.

17.    CW1 has told investigators that developers and contractors will pay bribes to DCAP employees for: a) speeding up the Standard Plan Review process; and b) obtaining quicker review appointments. CW1 has admitted to paying bribes to certain clerical employees and technical reviewers in DCAP for these actions.

18.    CW1 has told investigators that developers and contractors will pay bribes to Buildings employees for: a) overlooking construction work which does not conform to City building codes; b) overlooking work performed beyond the scope of a construction permit; c) removing building code violations; d) lifting stop work orders; e) signing off on construction permits without performing an inspection; f) providing favorable or expedited inspections for a Certificate of Occupancy; and g) changing information in the City's mainframe computer system. CW1 has admitted to paying bribes to inspectors in Buildings for these actions.

19.    CW1 has told investigators that developers and contractors will pay bribes to AH employees for: a) expediting the AH process, and b) negotiating a settlement. CW1 has admitted to paying bribes to Buildings employees assigned to AH to facilitate adjudication of Buildings cases in AH in a manner favorable to CW1's clients.

## V.    PROBABLE CAUSE[3]

20.    According to City of Chicago personnel records, ANTHONY VALENTINO has been employed by the City since July 2, 2001, and currently holds the position of Zoning Investigator in the Department of Zoning.

### *Historical Bribe Payment Information From CW1*

21.    According to CW1, CW1 has paid bribes to VALENTINO on behalf of developers/contractors in exchange for favorable treatment. These include an occasion in approximately 2005 during which CW1 approached VALENTINO to inquire if VALENTINO could assist CW1 in obtaining zoning approval for illegal dwelling units for a project on the north side of the City. CW1 paid a bribe of approximately $8,000 to VALENTINO in exchange for VALENTINO preparing an inspection report which falsely identified the illegal dwelling units as existing dwelling units. (Investigators have learned from City officials during the course of this investigation that changing the number of units being developed in a building renovation project would normally require

---

[3]

Throughout this Affidavit, I describe various conversations that were consensually recorded. All times listed are approximate. The summaries of the recorded conversations set forth in this Affidavit are based on draft – not final – transcriptions. Finally, the summaries below do not include all potentially criminal consensually recorded conversations, or all statements or topics covered during the course of the conversations.

a zoning variance, which could take six months to one year to complete, with no guarantee that the zoning variance would be approved.)  On another occasion, also in approximately 2005, CW1 approached VALENTINO to request a favorable zoning inspection report for a Certificate of Occupancy.  VALENTINO prepared the zoning inspection report and in return CW1 paid a bribe of $500 to Valentino.

### Earlier Controlled Bribe Payments – 1453 West Garfield Boulevard and Walton Street

22.    CW1 told investigators that in approximately May 2007, prior to CW1's cooperation with the government, VALENTINO performed fraudulent favorable zoning inspections for CW1 pertaining to Certificates of Occupancy at 1453 West Garfield Boulevard and a second project on Walton Street[4] in exchange for agreed upon cash bribes.  At the time CW1 began cooperating with the government, CW1 had not yet paid the bribe money to VALENTINO for the previously performed fraudulent favorable inspections.  CW1, as part of CW1's cooperation, then made arrangements and paid the previously agreed upon bribe money to VALENTINO acting at the direction of agents.

23.    Specifically, on June 1, 2007 at approximately 12:54 pm, at the direction of agents, CW1 made a consensually recorded telephone call to VALENTINO.  I have reviewed the recording of this conversation.  During the conversation, VALENTINO arranged to meet with CW1 to get the bribe payments for the Garfield and Walton projects.  During the conversation, CW1 discussed meeting the following week.  VALENTINO told CW1 that he did not want CW1 "to think there's any rush" and stated

---

[4] CW1 does not recall the specific address on Walton Street, and investigators have been unable, due to the covert nature of the investigation, to determine and verify the address.

that he "just got uh you know we could straighten out a little fight that we had last time." According to CW1, the "little fight" was a reference to the fact that VALENTINO was looking to secure the bribe payment from CW1 for the favorable zoning inspections performed on the Garfield and Walton projects.

24.    On the morning of June 6, 2007, CW1 met with agents at the briefing location. Agents gave $500 cash to CW1 to pay a bribe to VALENTINO for the Garfield project.[5]  The money was photocopied and placed in an envelope in the presence of agents. An audio recording device was placed on CW1. At approximately 9:30 am, CW1 was driven by agents to the Dunkin Donuts located at Washington and Wells to meet with VALENTINO.    At approximately 9:35 am, surveillance agents videotaped VALENTINO entering the Dunkin Donuts.  Due to the location of VALENTINO and CW1 inside of the store, surveillance agents were unable to observe CW1 and VALENTINO during the meeting.    Surveillance agents were not able to videotape VALENTINO leaving the Dunkin Donuts following the meeting due to their position but did videotape VALENTINO walking down the street away from the Dunkin Donuts a short time after the meeting.  At the conclusion of the meeting, CW1 was picked up by agents and taken to the briefing location. CW1 informed agents at the debriefing that CW1 had delivered the envelope containing $500 cash to VALENTINO for the favorable zoning inspection for the Garfield property.  The meeting was audiorecorded, and I have reviewed the recording.  The conversation was brief and primarily personal in nature.

---

[5]

For this and each controlled bribe meeting described in this affidavit, agents searched CW1's personal effects but not CW1's person or vehicle.

25.    On June 8, 2007 at approximately 9:24 am, at the direction of agents, CW1 made a consensually recorded call to VALENTINO. I have reviewed the recording of this conversation. During the call, VALENTINO told CW1 that "I just want to talk to you about some of the tickets that we talked about." CW1 understood "tickets" to be a reference to the bribe payments. CW1 and VALENTINO agreed to talk later.

26.    On June 11, 2007 at approximately 10:49 am, CW1 made a consensually recorded call to VALENTINO. I have reviewed the recording of this conversation. During the conversation, CW1 and VALENTINO discussed the bribe payment of June 6, 2007. Specifically, CW1 stated: "I wanted to let you know that I apologize because that Walton, I left the tickets behind that day because I raced out of the house" to which VALENTINO responded "Oh. Okay." CW1 added that "The other tickets were for Garfield" [bribe money for Garfield] to which VALENTINO responded "Right, right." CW1 reassured VALENTINO that CW1 would call in the morning and they could possibly meet the following day. VALENTINO said that whatever worked for CW1 was fine and that he "didn't know if you forgot about that, that one play or not but since you have not, don't worry about it." According to CW1, "that one play" is a reference to the remaining bribe payment on the Walton property. CW1 confirmed that CW1 had "five tickets for Walton" [$500 Walton bribe] to which VALENTINO responded, "That's wonderful. Thank you."

27.    On the morning of June 14, 2007, CW1 met with agents at the briefing location. Agents gave $500 cash to CW1 to pay a bribe to VALENTINO. The money was photocopied and placed in an envelope in the presence of agents. An audio

recording device was placed on CW1.  At approximately 9:38 am, CW1 was driven by agents to the Dunkin Donuts located at Washington and Wells to meet with VALENTINO.  Shortly after CW1's arrival, surveillance agents observed VALENTINO entered the Dunkin Donuts.

28.    The meeting was audiorecorded.  I have reviewed the recording.  During the meeting, VALENTINO told CW1, "This is what I wanted to show you." CW1 later informed agents that at this point in the conversation, VALENTINO opened up a folder he was carrying.  VALENTINO continued: "It's really nothing.  I'm just going through this in case anybody is looking.  You can put that right in here." CW1 later told agents that at this point in the conversation, VALENTINO was indicating that CW1 put the bribe payment in the folder.  CW1 informed VALENTINO: "This is for Walton" [referring to the Walton bribe payment].  VALENTINO responded, "Okay.  That's good. We're all caught up" and added that "tickets are ... all the plays are in." CW1 understood this to mean that all the bribes had been paid.  VALENTINO then told CW1: "It's getting more and more difficult I know for everybody to do what they need to do.  But, as long as we can set something up through the right channels…we'll be able to…I mean, if you need anything you can always call me or Bill [which CW1 understood as a reference to zoning inspector Bill Wellhausen].[6]

29.    Due to the location of VALENTINO and CW1 inside the store, surveillance agents were unable to observe CW1 and VALENTINO during the meeting. At the conclusion of the meeting, CW1 was picked up by agents and taken to the briefing

---

[6]
Wellhausen has been charged in a separate federal criminal complaint.

location. CW1 informed agents at the debriefing that CW1 had delivered the envelope containing $500 bribe to VALENTINO in exchange for the favorable zoning inspection on the Walton project.

### Controlled Bribe Payment Pertaining to 2754 West Washington Boulevard

30.    On July 17, 2007 at approximately 11:48 am, at the direction of agents, CW1 placed a consensually recorded call to VALENTINO.    I have reviewed the recording of this conversation.    During the conversation, CW1 asked VALENTINO for a fraudulent favorable zoning inspection in connection with a Certificate of Occupancy inspection at 2754 West Washington Boulevard in exchange for a cash bribe.[7] Specifically, CW1 told VALENTINO that CW1 had learned that VALENTINO was the zoning inspector for a Certificate of Occupancy inspection for 2754 West Washington, a property of a client of CW1's.    VALENTINO told CW1 that he would be going out there the next morning to do the inspection.    CW1 responded: "Okay.    All right well call me and update me on that and we'll just do the usual."    CW1 told investigators that CW1 was referring to the usual $500 bribe payment in exchange for a favorable inspection. VALENTINO questioned what was going on with the property.    CW1 informed VALENTINO, "something about there's eight units" and "he supposedly de-converted from twelve to eight."    CW1 told investigators that CW1 was referring to the fact that

---

[7]

CW1, acting at the direction of agents, agreed to accept bribe money from developer Petru Cladovan, who agreed to paid bribe money to CW1 in exchange for CW1 securing a favorable zoning inspection for 2754 West Washington from the zoning inspector (VALENTINO). As part of the controlled bribe done at the direction of agents, Cladovan subsequently paid CW1 bribe money for the favorable inspection. Cladovan has been charged in a separate federal criminal complaint.

there might be zoning issues.  CW1 told VALENTINO to "let me know, you know, what the situation is."  CW1 added that the developer was "aware of it and he will do whatever it takes."  CW1 told investigators that CW1 was telling VALENTINO that the developer was aware of the fact that there could be zoning issues and was willing to pay whatever was needed to make sure that he gets the necessary approvals for the project. VALENTINO responded, "Okay got you."  CW1 and VALENTINO agreed that CW1 would wait to hear from VALENTINO and they would take things from there.

31.     On July 18, 2007, at approximately 10:42 am, CW1 received a call from VALENTINO. The call was consensually recorded and I have reviewed that recording. During the conversation, VALENTINO discussed with CW1 the inspection that he performed at 2754 West Washington Boulevard.  VALENTINO told CW1 that he had just left the Washington property and explained that the "de-conversion was okay" and "he's got eight units there that he should have" but "he's got a few little things he needs to correct, but, but it shouldn't be a big deal." VALENTINO added that all the developer "would have to do is bring his occupancy in and they'll take care of it." CW1 understood "they'll take care of it" to mean that zoning would issue an up-to-date certificate of occupancy. CW1 let VALENTINO know that CW1 would talk to the developer and then get back to VALENTINO.

32.     On August 6, 2007, at approximately 1:08 pm, CW1 placed a consensually recorded call to VALENTINO.  I have reviewed the recording.  During the conversation, CW1 asked VALENTINO whether there was something CW1 should address with the developer of the "Washington" property.  VALENTINO responded:

17

"No. He had - - yeah, he had a couple of issues, a porch for one thing. He had some of the - - his balusters were not four inches apart. He had horizontal ones there. He had another couple issues and I forgot what the hell they were because I didn't write any of them down. But just tell him he had a number of - - a couple of issues and you know he got passed anyway, so." CW1 understood this to mean that VALENTINO passed the property on the zoning inspection despite the fact that it had issues, as agreed upon, in exchange for a $500 bribe. VALENTINO told CW1 "whenever you get it together just let me know." CW1 understood "it" to be a reference to bribe money from the developer.

33.    On August 7, 2007 at approximately 1:32 pm, CW1 placed a consensually recorded call to VALENTINO. I have reviewed the recording. During the conversation, CW1 discussed meeting with VALENTINO for the purpose of paying him a bribe for the inspection of the 2754 West Washington project. Specifically, CW1 told VALENTINO that CW1 had "just met my guy on Washington." CW1 had told law enforcement that CW1 was telling VALENTINO that CW1 had just picked up the bribe money from the developer of the West Washington Street property. CW1 and VALENTINO agreed to meet the following morning.[8]

34.    On the morning of August 8, 2007, CW1 met with agents at the briefing location. Agents gave $500 cash to CW1 to pay a bribe to VALENTINO. The money was photocopied and placed in an envelope in the presence of agents. An audio recording device was placed on CW1. At approximately 9:10 am, CW1 was driven by

---

[8]

On August 7, 2007, Cladovan gave CW1 $2000 in bribe money to pay City officials, provided in exchange for favorable inspections on the Washington property.

agents to the Dunkin Donuts located at Washington and Wells to meet with VALENTINO. Shortly after CW1's arrival, at approximately 9:23 am, surveillance agents observed and video recorded VALENTINO enter the Dunkin Donuts with a file folder in his hand. Nothing appeared to be in the file folder.

35.    The meeting was audiorecorded. I have reviewed the recording of the conversation. During the meeting, CW1 confirmed that VALENTINO did "the interior and exterior 'cause it was for all units." According to CW1, CW1 was confirming the inspections VALENTINO did. CW1 asked whether "they were okay with everything." According to CW1, CW1 was asking whether the inspections had all been passed. VALENTINO responded, "Yeah it was good."

36.    Due to the location of VALENTINO and CW1 inside the store, although surveillance agents were able to observe CW1 and VALENTINO during the meeting, they were unable to observe whether any items were passed between CW1 and VALENTINO during the meeting. Surveillance agents observed and video recorded VALENTINO leaving the store at the conclusion of the meeting with a large envelope inside of the file folder. At the conclusion of the meeting, CW1 was picked up by agents and taken to the briefing location. CW1 informed agents at the debriefing that CW1 had delivered the envelope containing $500 cash to VALENTINO.

37.    Investigators obtained information from two confidential sources who are both professionals in the marketing and sales of new construction and condominium rehabilitations in Chicago with fourteen years of experience. The sources informed investigators that the typical profit margin for a developer on the sale of a project that is a

multi-unit condominium rehabilitation or new construction condominium building located in Chicago is at least 20%. The profit margin range can vary based upon variables including the original cost of the land, construction costs, and time on the market before sale. One of the sources, who is familiar with the underlying financing of such projects, informed investigators that lenders generally require that the developer establish a minimum of a 20% profit cushion before the lender will finance the project. Based upon a review of publicly available information, the property at 2754 West Washington is an eight unit condominium building. One of the units in the building has been sold for $310,000.

38.    City of Chicago records and the City's web site reflect that the City of Chicago is a unit of local government that received in excess of $10,000 in federal funding in a twelve-month period from August 8, 2006 through August 8, 2007.

39.    Based on the facts described above, I submit that there is probable cause to believe that ANTHONY VALENTINO, violated Title 18, United States Code, Section 666(a)(1)(B), in that between on or about July 17, 2007, and on or about August 8, 2007, VALENTINO, being an agent of the City of Chicago, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, and series of transactions of the City of Chicago, involving anything of value of $5000 or more, the City of Chicago being a local government that received in excess

of $10,000 in federal funding in a twelve month period from August 8, 2006 through

August 8, 2007.

David Hodapp
Postal Inspector
United States Postal Inspection Service

Subscribed and sworn to me this
**21** day of May, 2008:

Martin C. Ashman
U.S. Magistrate Judge